[Civ. No. 13729.   Second Dist., Div. One.   Aug. 31, 1942.]

AUGUST H. LINDSTROM, Respondent, v. DOUGLAS B. PALMER et al., Defendants; NATIONAL SURETY CORPORATION (a Corporation), Appellant.

James H. Sims and Bailie, Turner & Lake for Appellant.

Erwin H. Haas for Respondent.

YORK, P. J.—Respondent brought the instant action for fraud and deceit against the corporation, Palmer, Miller &

Co., a licensed security broker, and joined Douglas B. Palmer, James Crosson Miller, officers and stockholders of the corporation, and Harold Carter, a salesman. National Surety Corporation was also joined as surety for the corporation on its bond in the sum of $5,000.

From the judgment in favor of respondent and against Douglas B. Miller, Palmer, Miller & Co., and the National Surety Corporation, for $4,069.37, the National Surety Corporation prosecutes this appeal.

■ Appellant urges primarily that the evidence is insufficient to support the court's findings that the transaction here sued upon was a corporate rather than a personal transaction; and secondarily, that the evidence does not disclose that the said transaction was one covered by the surety's bond.

In addition to finding that respondent beginning on November 23, 1938, was a customer of defendant corporation and that he purchased through it as his broker 1660 shares of common capital stock of Interstate Aircraft & Engineering Corp., and on the 7th of February, 1939, was the owner of said shares, the court also found that on February 7, 1939, defendant corporation, through defendant Palmer acting in his capacity as president and general manager thereof, entered into an agreement to purchase from respondent said 1660 shares of said Interstate stock, at the agreed price of $4,070, of which the sum of $35 was forthwith paid in cash, the balance payable August 1, 1939, with interest at 6 per cent per annum. That at the time and as a part of the same agreement, defendant agreed that the said corporation would issue to respondent an aggregate of 370 shares of its preferred capital stock and 740 shares of its common capital stock and that on August 1, 1939, said preferred shares would be repurchased at $11 per share plus 6 per cent accrued interest from February 1, 1939. That on April 14, 1939, a certificate evidencing 370 shares of preferred stock of defendant corporation was transferred by defendants Palmer, Miller & Co. and Douglas B. Palmer to respondent, but only 74 shares of common stock were issued; "and it is true that the defendants did not, on August 1, 1939, or at any other time, faithfully and honestly perform their obligation to pay to plaintiff the agreed balance of $4015 together with interest at six per cent (6%) per annum from February 1, 1939, except that it is true that the defendants have heretofore paid to plaintiff the sum of $466 as and for interest for the

period from February 1, 1939, to January 20, 1941, and the sum of $182 on account of said principal.''

The court found that defendant corporation and defendant Palmer purchased said 1660 shares of Interstate from respondent ''with the purpose of reselling them and of offering them for sale to the public and that all of said shares were thereafter and within a short period of time sold by'' defendant corporation.

It was further found that in order to induce respondent to enter into said agreement, ''and for the purpose of deceiving, injuring and defrauding the plaintiff, the defendants, Palmer, Miller & Co., and Douglas B. Palmer, concealed from him facts which were particularly within their knowledge and which they knew to be true, to wit: That the financial condition of Palmer, Miller & Co., was bad and that it had accounts payable which were due and which it was unable to pay and knew that it had a deficit from operations in the sum of $16,000 or thereabouts and knew that the broker's certificate theretofore issued to it was to be cancelled and revoked by the Commissioner of Corporations because of the company's bad financial condition and impairment of capital. . . .

''VII. The court finds that it is true that the defendants Palmer, Miller & Co., and Douglas B. Palmer represented to plaintiff that the defendant Palmer, Miller & Co., was in a good condition and . . . that it had been in business a long time and was going to continue in the brokerage business; . . . that defendants represented that Palmer, Miller & Co. was to be the exclusive broker for the sale of all the stock of the Interstate Aircraft & Engineering Corp., and that if anyone wanted to buy its stock he would have to come to them to purchase it. That said representations were false and untrue and were known by the defendants at the time of making same to be false and untrue and that it is true that said statements and representations were made for the purpose of deceiving, injuring and defrauding the plaintiff and for the purpose of inducing the plaintiff into said agreement for the sale of his 1660 shares . . . that plaintiff believed and relied on said statements and representations and thereupon entered into said agreement and was injured and defrauded thereby.''

It was further found that on February 7, 1939, the articles of incorporation of defendant corporation did not provide for any preferred stock and that an amendment to its

articles of incorporation creating such preferred stock was not filed in the office of the Secretary of State until March 2, 1939, and at the time the said agreement was made on February 7, 1939, said corporation had no permit to sell and issue its preferred stock and at no time was such a permit issued by the Commissioner of Corporations. "That it is true that plaintiff did not purchase said shares of stock of Palmer, Miller & Co., but accepted same as a guarantee that the defendants would faithfully perform the obligations of their agreement."

As a conclusion of law from the facts found, the court decreed: "That the said transaction referred to in the foregoing findings of fact constituted a brokerage transaction under the terms and conditions of the bond filed and maintained by said defendant with the Commissioner of Corporations and within the meaning of the Corporate Securities Act of the State of California."

The agreement heretofore referred to was evidenced by the following letter introduced in evidence as Plaintiff's Exhibit No. 2:

"Palmer, Miller & Co., Investment Securities, 650 South Spring St., Los Angeles . . . February 7th, 1939 Mr. August H. Lindstrom, 228 West 30th St., Los Angeles, Calif. Dear Mr. Lindstrom: Attached is my personal note for the amount of $3,700 dated February 1st, 1939 and maturing August 1st, 1939 which bears interest at the rate of six per cent per annum. As collateral security for this note is 7500 shares of Palmer, Miller & Co. Common stock of which there is 25,000 shares outstanding.

"Palmer, Miller & Co. are amending their Articles of Incorporation to create a Six per cent Cumulative Preferred Stock $10.00 par value, callable at $11.00 per share. With each share of Preferred stock will be given two shares of Common stock.

"When the Preferred stock is ready for delivery it is understood you are to return the 7500 shares of Common stock and personal note $3700 to me and receive 370 shares of the Preferred stock of Palmer, Miller & Co., and 740 shares of Common stock.

"Receipt is hereby acknowledged of 1660 shares Interstate Aircraft & Engineering Corp. Common stock @ $2.25 per share, value $3735. Attached is my check for $35.00

"It is further understood I am to repurchase from you the 370 shares of Palmer, Miller & Co. Preferred stock on

August 1, 1939 at $11.00 per share plus accrued interest from February 1st, 1939.

"Yours very truly, Douglas B. Palmer."

Plaintiff's Exhibit 3 reads as follows:

"Palmer, Miller & Co., Investment Securities, 650 South Spring Street, Bank of America Building, Los Angeles, Calif.

Douglas B. Palmer, Office                Feb. 7, 1939

As PRINCIPALS we have this day BOUGHT from you for our own account:

| Quantity | Security | Price | Amount | Accrued Interest |
|---|---|---|---|---|
| 1660 | Interstate Aircraft & Engineering Corp. | 2-1/4 | $3735.00 | |

| Commission | Tax | Ins. Post, etc. | Credit |
|---|---|---|---|
| | .68 | | 3734.32 |

Assuring you of our appreciation of this business, we are,

"Yours very truly, PALMER, MILLER & CO. By CCR."

The evidence adduced at the trial reveals that defendant Carter, a licensed salesman for defendant corporation Palmer, Miller & Co., sold respondent the 1660 shares of Interstate Aircraft stock through Palmer, Miller & Co.; that during the early part of 1939 said Carter contacted respondent, at defendant Palmer's suggestion, and had him come to the office of the corporation. Moreover, Carter told respondent he could liquidate his Interstate Aircraft stock for more money.

Defendant Palmer, called as a witness by respondent testified he was the president and general manager, as well as one of three directors of the corporation and owned one-half of its 25,000 outstanding shares of stock, defendant Miller owning the other half; that between January 1 and February 7, 1939, the Commissioner of Corporations made an investigation of the books of the corporation and took objection to a lot of items which the corporation had in its statement referring to deferred liability; that after the purchase of respondent's 1660 shares of Interstate Aircraft had been placed in the inventory of the corporation on February 7, 1939, the corporation's assets were above its liabilities and it had an operating loss of approximately $14,000; said witness testified he did not tell respondent that Palmer, Miller & Company had

an operating deficit and did not tell him that it had been operating at a loss, but he did tell respondent that the company needed additional working capital for the business; that the company intended making application to the Commissioner of Corporations for a permit to raise $10,000 through the sale of preferred stock and "I asked Mr. Lindstrom if he would be interested in acquiring some of the preferred stock of the corporation and Mr. Lindstrom said he would see what the situation was, that he had contemplated a trip to the old country, but that he would let me know his situation at a later date. At a later date Mr. Lindstrom was in my office and we again discussed—. . . I told Mr. Lindstrom that the brokerage companies had been rather hard put of late; that the market had been dull; that I didn't know of any houses on the street that were making any money . . . that we had made arrangements to handle such an issue of the American Aircraft Company . . . Mr. Lindstrom came into the office a few days afterwards at which time we went into the market value of his Interstate Aircraft Corporation stock. . . . The market at that time was $2.25. I told Mr. Lindstrom that we would sell his stock at that price; that he would realize $3735 and that he would acquire 370 shares of preferred stock of Palmer, Miller & Company." After some further negotiations, Mr. Lindstrom came to the office of the corporation and told Mr. Palmer that "he had pretty well made up his mind that he desired to go to the old country in a year and therefore wanted to leave without having any securities here . . . he wanted to be sure that anything he bought at this time could be relinquished. I told Mr. Lindstrom that under the laws of the State of California a corporation could not buy back its own stock; therefore, that I could not obligate the corporation in any way, but that if he desired to make a personal transaction with me, that I would buy his stock and give him a repurchase agreement . . . that is in writing (Plaintiff's Exhibit 2)." After said agreement was executed, Mr. Lindstrom turned over to Mr. Palmer the 1660 shares of Interstate Aircraft stock, with respect to which Mr. Palmer stated: "I gave them into the cashier's department at Palmer, Miller & Company and told them that I had purchased this stock from Mr. Lindstrom and for them to make out statements. Q. And immediately received a credit on the books of the corporation for the sale of those 1660 shares of stock to the Palmer, Miller & Company? A. The stock would enter my personal account,

Mr. Haas. From my personal account I turned over the stock to Palmer, Miller & Company. Q. On the same day? A. Yes." Whereupon, plaintiff's Exhibit 3, heretofore set out, was introduced into evidence.

Respondent testified that early in 1939 Mr. Carter came to see him to find out if he (respondent) wanted to dispose of some stock he owned and if he would be interested in oil stock. ". . . Then he introduced Mr. Palmer of Palmer, Miller Company. . . . He (Palmer) was going to issue preferred stock. He (Carter) asked me how I would like that. Well, I told him I didn't know anything about it but maybe I could look into it. So he wanted me to see Mr. Palmer. Then I talked to Mr. Palmer a little about it. I wanted to sell for cash if I could and get the money. I wanted to invest the money in something else. At that time Mr. Palmer told me, and Mr. Carter I think had told me too, that he was going to have an amendment to their incorporated business, and that they were going to issue some preferred stock in place of the common. And I thought myself that will be all right, but I wanted to dispose of that Palmer, Miller Company stock. . . . The agreement was drawed up and I looked at it and it was all right. . . . and we done the business and I was going to get the preferred stock as soon as it was issued but it was not ready yet; I had to wait for a little while. Then he gave me a note and some common stock as the security, or whatever you call it, so that when the preferred stock is all fixed up I will get that and then I have to turn back the common stock I held to Palmer, Miller, and also Mr. Miller's (Palmer's) note. . . . Mr. Palmer never said anything about the company's affairs and business, only that it was all right; they were in that business and was going on with that business, and get all the aircraft corporation stock, and have a sale of that and them alone. And for that reason he insisted upon getting that 1660 shares I held because he was going to get all the aircraft corporation stock himself. . . . They were licensed and had a bond up so that everything was solid. That is what Mr. Carter told me, that they were solid. . . . Mr. Carter and Mr. Palmer both mentioned that to me." On cross-examination respondent was asked: "Q. Mr. Lindstrom, Mr. Palmer told you that the company could not guarantee to buy this stock back, and that he would handle this matter personally, didn't he? A. No, sir; not that I can remember—never anything said about

buying anything personally, but he promised he was going to buy the company's ten dollar preferred stock back in six months, which would be the first of August. Q. You knew Mr. Palmer was the one that was going to buy it back? A. He didn't say that he would, but I was doing business with him so naturally I thought he was doing it in the company's name, or his own—I thought it was in the company's name. The head on the paper was 'Palmer, Miller & Company,' and I thought it was all under the company. Q. You never had anything signed by the company by Mr. Palmer, did you? A. No, not that agreement. Q. They didn't sign the note, did they? A. The note was signed by Mr. Palmer, yes, sir. Q. And when you wrote to Mr. Palmer on July 25, you addressed the letter to Mr. Palmer, did you not? A. Yes. I found out his address and he was not in the office down there any more, so I believe I sent it to his home.''

Mr. Palmer further testified that when he received the stock mentioned in Exhibit 2 from Mr. Lindstrom ''I subjugated the stock to Palmer, Miller & Company. It went into their inventory and they sold the stock. THE COURT: Who got the money when that was sold? A. Palmer, Miller & Company. . . . Q. And you had actually turned over the 1660 shares to Palmer, Miller & Company and Palmer, Miller thereby received $3700? A. That is correct.''

It was stipulated that the broker's certificate of Palmer, Miller Company was suspended on March 9, 1939.

It should be noted that defendant Miller had ceased to be active in the corporation in July, 1938, and that he and the corporation's secretary had moved away from the office, leaving defendant Palmer in sole charge of the affairs of the corporation, as general manager.

The agreement to purchase the 1660 shares of Interstate Aircraft stock from respondent was clearly within the ordinary course of business of the corporation licensed to purchase and sell securities in this state. Moreover, the issuance by the Commissioner of Corporations under date of March 6, 1939, of a permit allowing said corporation to issue new common and preferred stock, pursuant to its application therefor, constituted a ratification of the agreement of February 9, 1939.

It must not be overlooked that respondent had been a customer of the corporation for several months prior to the transaction here in question; that all of his dealings were with Palmer, as an officer of the corporation, and with Carter

as a salesman employed by the corporation. While it is true that Palmer used the personal pronoun in his letters to respondent and that he signed the agreement without any designation of his official capacity or that he was acting on behalf of the corporation, all of these documents were written on the official letter head of the corporation. Moreover, the testimony on the issue as to whether defendant Palmer was dealing with respondent in his personal capacity or on behalf of the corporation is directly conflicting. While appellant urges that this conflict is not substantial, an examination of all of the evidence adduced as well as a consideration of all the circumstances surrounding the transaction reveal that such evidence is amply sufficient to sustain the findings of the trial court that the corporation was a party to the agreement of February 9, 1939.

Section 6 of the Corporate Securities Act, in effect when the bond here sued upon was filed with the Commissioner of Corporations, provided as follows: ". . . Said bond shall be conditioned upon the strict compliance with the provisions of this act, and the honest and faithful application of all funds received and the faithful and honest performance of all obligations and undertakings in the purchase or sale of securities, by said broker, his agents and employees." (Stats. 1933, p. 2315; Deering's Gen. Laws, 1937, Act 3814.)

In the case of *Bridges* v. *Price,* 95 Cal. App. 394, 396 [273 Pac. 72], "The evidence showed that on September 29, 1925, respondent Bridges delivered to one Ormond, as agent for Price, 210 shares of capital stock of National Automatic Music Co., to be exchanged for 336 shares of Monolith Portland Cement Company stock. Subsequently Price admitted to Bridges that he had sold his Music Company stock and had not procured the Cement Company stock, and on November 19, 1925, Price persuaded respondent to take his (Price's) promissory note for the value of the stock, payable twenty-seven days after date. The note was never paid, and after its maturity this action was brought on the original obligation and appellant [surety company] was joined as a defendant upon its bond. Judgment followed against both defendants."

It was there held: "Whatever may be meant by the word 'honest,' the 'faithful performance of all obligations and undertakings' means no more than performance of those obligations and undertakings according to their terms. Bonds

conditioned for the 'faithful performance' of a contract have always been construed as being breached by any failure of performance in the principal contract. [Citing authorities.] In fact, such bonds are frequently referred to as 'faithful performance bonds.' Price having failed in the faithful performance of his obligation in the sale and purchase of securities for Bridges, appellant became liable to Bridges upon its bond.'' The ruling in the cited case is applicable to the facts presented by the case at bar.

There was evidence before the trial court which justified each and all of the material findings upon which the judgment herein was predicated; therefore, the judgment appealed from is affirmed.

Doran, J., and White, J., concurred.